UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

MR. JOSH R. HILL,                          )
      *Plaintiff*,                          )
                                  )
      *vs.*                          )          1:12-cv-00089-JMS-DKL
                                  )
MICHAEL J. ASTRUE, Commissioner of Social )
Security,                          )
      *Defendant*.                          )

## ENTRY REVIEWING THE COMMISSIONER'S DECISION

Plaintiff Mr. Josh R. Hill applied for disability insurance benefits ("DIB") and Supplemental Security Income Benefits ("SSI") through the Social Security Administration ("SSA") in June 2007. [R. 133-34, 135-37.] After a series of administrative proceedings and appeals, including a hearing in May 2010 before Administrative Law Judge ("ALJ") Arline Colon, the Commissioner finally denied his application. [Dkt. 15-2 at 14.] The Appeals Council denied Mr. Hill's timely request for review of the ALJ's decision, rendering that decision the final one for the purposes of judicial review. 20 C.F.R. § 404.981. Mr. Hill then filed this action under 42 U.S.C. § 405(g), requesting that the Court review the ALJ's denial.

### I.
#### BACKGROUND

### A.  Pertinent Medical Evidence

Mr. Hill contends that he has been disabled since May 2007 due to brain atrophy and chronic brain syndrome resulting from loss of oxygen to his brain. [R. 133-34, 135-37.] On May 25, 2007, Emergency Medical Services ("EMS") were dispatched to Mr. Hill's home when he suffered a cardiac arrest. [R. 228-36, 349.] Within three minutes, a police officer arrived at the residence, observed that Mr. Hill was not breathing and had no pulse. [*Id*.] The officer

initiated CPR.  [*Id*.]   EMS arrived shortly thereafter, intubated the claimant, and used a ventricular defibrillator to "shock" Mr. Hill approximately six times.  [*Id*.]

Upon Mr. Hill's arrival to the emergency room, doctors observed that he was cyanotic and exhibited elevated Troponin levels.  [R. 279, 331.]  An EKG showed a wide QRS interval as well as moderate left ventricular dilatation, severe global left ventricular hypokinesis, a mildly reduced right ventricular global systolic function, papillary muscle dysfunction, moderate mitral regurgitation, and en estimated left ventricle ejection fraction ("LVEF") measuring 14.9 percent.  [R. 279, 304-305.]   A computerized tomography ("CT") scan of Mr. Hill's head revealed diffusely prominent cerebrospinal fluid spaces suggesting global atrophy.  [R. 352.]   An electroencephalogram ("EEG") showed activity that was "moderately to severely, diffusely slow."  [R. 361.]  It also showed right frontocentral cominant spike discharge placing Mr. Hill at risk for partial onset and secondarily generalized seizures.  [*Id*.]

Mr. Hill underwent an EEG on May 27, 2007.  [R. 357-358.]  This procedure returned abnormal results, indicating the presence of a low-amplitude irregular background rhythm.  [*Id*.]

A follow-up EKG performed on May 30, 2007, evidenced severe global hypokinesis of the left ventricle, mild left atrial dilation, and an estimated left LVEF measuring 20-25 percent.  [R. 299-300.]   A chest X-ray conducted on this day showed increased aeration in the left lung base with minimal platelike atelectasis.  [R. 450.]

S. Roberts, a speech pathologist, evaluated Mr. Hill on May 31, 2007, and documented that he displayed diminished attention and concentration, pronounced agitation, and evidence of hallucinations.  [R. 484.]

2

Mr. Hill was finally discharged from the hospital on June 2, 2007.  He was released into an extended care facility in Anderson, Indiana.  [R. 368.]  Mr. Hill subsequently began a course of physical and occupational rehabilitation.  [R. 520-524.]

While in the rehabilitation facility, cardiologist Dr. R. J. Price examined Mr. Hill on June 14, 2008, for an accelerated Medicaid review.  [R. 405-406.]  In doing so, Dr. Price diagnosed anoxic brain damage, severe cardiomyopathy, class IV heart disease, and congestive heart failure.  [*Id.*]

Mr. Hill presented for a speech and language evaluation on June 19, 2007.  [R. 457-58.] The examining physician documented severe cognitive deficits, diminished ability to focus, attend, or retain information, and an inability to consistently and effectively communicate needs or wants.  Mr. Hill was oriented to name only.  [*Id.*]  The clinician concluded Mr. Hill suffered from "severe cognitive deficits overall" and recommended he continue with therapy.  [*Id.*]

Mr. Hill underwent a follow-up on July 26, 2007.  [R. 666.]  This diagnostic procedure showed improved left ventricular function but documented a slightly reduced ejection fraction due to generalized hypokinesis.  [*Id.*]  It also demonstrated mild mitral and tricuspid regurgitation.  [*Id.*]

In July and August of 2007, as he began to physically recover, Mr. Hill began displaying substantial behavioral problems.  He made continual requests for pain pills or liquor, at one point attempting to break into a medication.  In late August, he attempted to "escape" twice.  Mr. Hill was discharged on August 31, 2007.  Staff members noted that Mr. Hill still required assistance to bathe, brush his teeth, shave, or use the restroom.

Slightly more than a month later, on October 3, 2007, at the request of the Disability Determination Bureau ("DDB"), Mr. Hill met with Dr. Lida Mina for a consultative examination

("CE").  [R. 577-581.]  At this meeting, Mr. Hill's father reported that his son suffered from generalized weakness, inability to focus, severe headaches, and occasional seizure-like episodes. [*Id*.]  On examination, Dr. Mina documented a flat affect and "generalized slowness."  [*Id*.]  She noted that Mr. Hill was unable to do serial subtractions and was only oriented to person and place.  [*Id*.]  He was disoriented to time.  [*Id*.]  Consequently, Dr. Mina diagnosed generalized confusion secondary to anoxic brain injury.  [*Id*.]  She wrote that "the patient is physically fine, however mentally mildly debilitated.  He would be unable to hold any kind of work that would require memory or mild mental challenge."  Dr. Mina also opined that Mr. Hill needed a workup to address his seizures before returning to work.  [*Id*.]

Less than a week later, on October 9, 2007, Mr. Hill visited Dr. Glenn Davidson for a psychological CE.  [R. 591-603.]  Dr. Davidson had no access to "neurological data" from Mr. Hill's hospitalization or rehabilitation.  [*Id*.] Dr. Davidson observed a flat affect, intelligible speech, and unremarkable motor behavior.  [*Id*.]  He noted Mr. Hill was oriented to person and place, but was wrong about the day of the week, the date, and had no estimate of current time. [*Id*.]  Mr. Hill's father accompanied him to the examination and reported Mr. Hill continued to exhibit problems with concentration and memory, e.g. he could take his own bath, but they felt they needed "to monitor" him.  [*Id*.]

Dr. Davidson administered a Wechsler memory Scale – Third Edition ("WMS-III"), which revealed an extremely low immediate visual memory score.  [R. 584-593; 602-603.]  Mr. Hill's raw scores on the test were as follows: 28 in "Faces I – Recognition," 2 in "Verbal Paired Assoc I – Recall," 2 in "Family Pictures I – Recall," and 9 in ""Spatial Span."  [*Id*.]  After administering these few portions of the test, however, and seeing the scores scaled to a 57 in both Auditory Immediate – Visual Immediate and Visual Immediate – Visual Delayed, Dr. Davidson

discontinued the assessment due to the extremely poor results. [*Id*.] He felt any diagnosis would be unreliable, yet went on to opine he felt Mr. Hill may be faking or exaggerating. [*Id*.] Again, he noted he lacked any neurological notes from Mr. Hill's extensive hospital stay. [*Id*.] Accordingly, Dr. Davidson wrote that "a review of any psychiatric or neurological notes during the hospitalization or nursing home stay could prove contradictory." [*Id*.]

On October 19, 2007, Dr. J. Sands reviewed the evidence on file and performed a Physical Residual Functional Capacity ("RFC") assessment regarding Mr. Hill's claim for benefits. [R. 594-601.] In doing so, he determined that Mr. Hill could occasionally lift and/or carry 20 pounds; frequently life and/or carry 10 pounds; sit, stand, and/or walk about six hours in an eight-hour day; and push and/or pull up to the capacity for lifting and carrying. [*Id*.] Dr. Sands determined that Mr. Hill should never climb ladders, ropes, or scaffolds, but could occasionally climb ramps or stairs. [*Id*.] According to the reviewing doctor, Mr. Hill could balance occasionally and needed to avoid concentrated exposure to noise, vibration, fumes, odors, dusts, gases, and hazards such as heights or machinery that would not cease operation with interruption by human contact. [*Id*.]

In November of 2007, Mr. Hill began seeing Dr. Alan Anthony as a primary care physician. [R. 674-679.]

On December 11, 2007, (still within six months after his release from an acute care center) at the request of the DDB, Mr. Hill met with Dr. Kenneth McCoy for a second psychological CE. [R. 763-768.] During a mental status examination, Dr. McCoy noted that Mr. Hill thought it was 1994 and could not remember his address. [*Id*.] Administering a WMS-III, Dr. McCoy documented scores for immediate memory (both visual and auditory), delayed memory (both auditory and visual), auditory recognition and discrimination, working memory,

and general memory which fell into the "extremely low" range.  [*Id.*]  Consistent with earlier testing by Dr. Davidson, Mr. Hill scored a 3 in "Faces I," a 2 in Verbal Paired Assoc I – Recall," a 1 in "Family Pictures I – Recall," and a 3 in "Spatial Span."  [*Id.*]  Dr. McCoy did not diagnose malingering, but claimed Mr. Hill's low scores were due to a "lack of effort."  [*Id.*]  Dr. McCoy concluded, "It is possible these impairments are related to the trauma involving oxygen deprivation."  [*Id.*]  He diagnosed depressive disorder and cognitive disorder.  [*Id.*]

Dr. Joelle Larsen of the Indiana Disability Bureau completed a Psychiatric Review Technique on December 20, 2007.  [R. 609-636.]  She concluded that Mr. Hill's mental impairments did not meet or equal a Listing.  [*Id.*]  Dr. Larsen determined that cognitive disorder imposed moderate limitations regarding his ability to maintain social functioning.  [*Id.*]

Dr. Larsen subsequently completed a Mental RFC regarding Mr. Hill's claim.  [R. 605-607.]  She opined that Mr. Hill suffered from moderate limitations regarding his ability to understand, remember, and carry out detailed instructions, maintain his attention and concentration for extended periods, make simple, work-related decision, complete a normal workday and workweek without interruptions from psychologically based symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods.  [*Id.*]  In support of her findings, she pointed to Mr. Hill's report to the consultative examiner that he could watch television, read, and perform self-care.  [*Id.*]  Although Dr. Larsen identified "somewhat impaired" attention and concentration, she noted Dr. Davidson's suspicion that Mr. Hill had exaggerated his symptoms, without noting Dr. Davidson's reservations about not having a full record.  [*Id.*]  Dr. Larsen wrote that the claimant "might prefer to avoid public contact," but concluded he "appears to have the cognitive abilities and concentration" necessary to complete simple, repetitive tasks.  [*Id.*]

On February 4, 2008, Mr. Hill's primary care physician, Dr. Anthony, wrote a letter regarding Mr. Hill's application for disability benefits.  [R. 673.]  He explained that Mr. Hill suffered from congestive heart failure, alcoholic cardiomyopathy, and a history of myocardial infarction with anoxic brain damage causing impaired speech and a slow thought process. Dr. Anthony noted that Mr. Hill is "often unable to comprehend what is said to him."  [*Id.*]  He added his opinion that "[Mr. Hill] is permanently disabled and unable to hold a job of any kind." [*Id.*]

Mr. Hill met with Dr. Clifford Hallam for a cardiology consultation on February 25, 2008.  [R. 645-646.]  Dr. Hallam documented that Mr. Hill demonstrated no significant cardiac symptoms, but did diagnose "modest memo [sic] changes" and noted Mr. Hill's cognitive status remained severely impaired, writing "his mental status has not improved significantly at all. [*Id.*]  He has virtually no short term memory and is not at all conversant during out interview." Consequently, Dr. Hallam concluded, "I do not believe his mental status would allow him to undertake any kind of meaningful employment."  [*Id.*]  He warned Mr. Hill not to drink alcohol, but noted his uncertainty as to whether Mr. Hill understood this admonition "at all."  [*Id.*]

Three days later, on February 28, 2008, Mr. Hill returned to Dr. Anthony.  At that time, he complained of difficulty sleeping.  [R. 658-663.]  Dr. Anthony diagnosed insomnia and prescribed Trazadone.  [*Id.*]  He also diagnosed gastroesophageal reflux disease ("GERD") and depression.  [*Id.*]  Mr. Hill continued to see Dr. Anthony for regular visits throughout 2008 and complained of frequent headaches, difficulty sleeping, and depression.  [*Id.*]

Mr. Hill visited Dr. Bruce Waller for a cardiology follow-up on September 10, 2008.  [R. 681-682.]  While Dr. Waller noted that Mr. Hill's cardiac condition appeared to be stable, he

wrote that "he virtually has no short term memory and is not conversant during my conversation with his father."  [*Id.*]

Mr. Hill underwent a precautionary EKG on April 7, 2009.  [R. 656-657.]  This procedure demonstrated a mildly dilated left ventricle, mild global hypokinesis, an almost normal left ventricle ejection fraction measuring 45-50 percent at rest, mild concentric left ventricular hypertrophy, mild mitral and tricuspid regurgitation, and dilation of the right atrium and right ventricle.  [*Id.*]

On June 29, 2009, Mr. Hill presented to Dr. Anthony and complained of worsening depression because of the recent death of his sister.  [R. 650-652.]  He reported experiencing anxiety, a depressed mood, and difficulty sleeping.  [*Id.*]  Mr. Hill also indicated that he had been suffering from frequent headaches.  [*Id.*]  After an examination, Dr. Anthony diagnosed major depressive affective disorder, headaches, hypertension, and insomnia.  [*Id.*]  He prescribed Naproxen, Vistaril, and Welbutrin.  [*Id.*]  At a primary care consultation on September 15, 2009, Mr. Hill complained of irritability, anxiety, depression, and difficulty sleeping.  [*Id.*]  Dr. Rebecca Davisson noted "the patient is having memory loss" and diagnosed insomnia, depression / psychosis, and hypertension.  She prescribed Ambien.  [*Id.*]

EMS services brought Mr. Hill to the emergency room on November 7, 2009, after police became involved in a domestic dispute.  [R. 694-699.]  His family informed EMS that Mr. Hill had taken approximately 20 pain pills.  [*Id.*]  Doctors treated Mr. Hill for a Tylenol overdose and released him.  [*Id.*]

On December 9, 2009, Mr. Hill met with Paula Gardner for a psychological consultation.  [R. 722-726.]  At that time, Mr. Hill complained of a poor memory, stating that his mother frequently reminded him to take his medication.  [*Id.*]  He admitted having a history of alcohol

abuse, but claimed he currently did not drink.  [*Id*.]  During the examination, Dr. Gardner observed Mr. Hill to be "somewhat slow in responding," not oriented to time and place, and having difficulty understanding directions.  [*Id*.]  Dr. Gardner noted that although he was asked to complete a three-page questionnaire, Mr. Hill only completed the top page.  [*Id*.]  Mr. Hill required prompting before completing the final two pages.  [*Id*.]

Dr. Gardner administered the only testing to Mr. Hill conducted outside the twelve-month period following his original injury/event, a Wechsler Adult intelligence Scale, Third Edition ("WAIS-III").  [R. 725-733.]  She concluded Mr. Hill's intellectual functioning fell into the "extremely low" range (Verbal IQ of 66, Performance of 62, and Full Scale of 62) and was consistent with mild mental retardation.  [*Id*.]  Dr. Gardner also documented Mr. Hill's memory functioning to be "significantly lower than one would expect given his level of intelligence" and wrote that "this is likely to have a major impact on his daily functioning."  [*Id*.]  She felt that these results were valid and consistent with those obtained by Dr. Kenneth McCoy in December of 2007.  [*Id*.]  Dr. Gardner diagnosed cognitive disorder.  [*Id*.]

On April 5, 2010, Mr. Hill returned to Dr. Waller, the cardiologist who initially saw him on September 10, 2008.  [R. 747.]  At that time, Dr. Waller, like Dr. Hallam, noted the presence of "modest memory status change."  [*Id*.]  Dr. Waller reported that Dr. Hill's cardiac symptoms continued to be under control.  [*Id*.]

On April 7, 2010, Mr. Hill presented for a follow-up EKG.  [R. 745.]  This procedure demonstrated normal left ventricular systolic function, trivial mitral regurgitation, and mild tricuspid insufficiency.  [*Id*.]

### B.  Summary of Testimony

Mr. Hill's administrative hearing was held by way of video teleconference on May 3, 2010.  Mr. Hill testified that he stopped working shortly before his heart attack in 2007 to go to another job.  [R. 41.]  He reported spending a period of time in a rehabilitation facility before coming to stay with his parents.  [R. 42.]  When asked if any of his impairments had improved since his heart attack, Mr. Hill responded, "Memory seems coming back some."  [R. 42.]  Mr. Hill subsequently testified he typically watched whatever anyone else was watching on television or sat on his front porch all day.  He explained that he warmed up food in the microwave in two-minute intervals until the food was done, vacuumed upon his parents' request, and went fishing with his neighbor.  [R. 42-45.]  He admitted his parents were not happy with how well he performed chores.  [R. 44.]  He also noted he attended church weekly at the insistence of his mother.  [*Id.*]

Mr. Hill testified that he consumed alcohol one month before the hearing.  [R. 48.]  Despite acknowledging his parents forbade alcohol and consuming it could worsen his cardiac condition, Mr. Hill reported using money his parents have him for cigarettes to buy alcohol.  [*Id.*]  He claimed it was the first time he had used alcohol since his heart attack.  [*Id.*]  Although he stated he did not need reminders to bathe or brush his teeth, Mr. Hill claimed he was disabled because of his terrible memory.  [R. 49.]

The ALJ then questioned Mr. Hill.  She asked Mr. Hill to describe his past relevant work.  He testified he had worked as a forklift driver, trailer assembler, and foundry worker.  [R. 50-51.]  When asked to describe his social activities, Mr. Hill stated that he went to church every Sunday and occasionally spent time with his three sons.  [R. 51-52.]

Mr. Hill's father then testified that Mr. Hill would disappear with friends approximately once or twice every month to drink. [R. 55-56.] He added that Mr. Hill vacuumed or mowed the law when asked, but indicated that Mr. Hill would randomly stop performing such tasks to get a soda or watch television and needed a reminder to return to the task at hand. [R. 57-58.] He further testified that Mr. Hill used to perform chores without being asked and completed them without incident prior to the trauma. [R. 60.]

Upon questioning by the ALJ, Mr. Hill's father testified that Mr. Hill lived with him prior to his heart attack and "helped all around the house." [R. 59-61.] When asked if Mr. Hill had trouble remembering things, his father responded, "Well, like this morning when we got up, he asked what time it was we had to be over …. He asked about a dozen times." [R. 63.]

The ALJ subsequently asked the vocational expert, Dr. Bordieri, to classify Mr. Hill's past relevant work. Dr. Bordieri classified Mr. Hill's past relevant work as follows: forklift operator (found at 921.683-050 in the Dictionary of Occupational Titles ("D.O.T.") with a SVP placing it in the "semi-skilled" range and medium physical demand), a factory laborer (found at 559.686-026 in the D.O.T. with a SVP placing it in the "unskilled" range and medium physical demand), a trailer assembler (found at 806.684-082 in the D.O.T. with a SVP placing it in the "semi-skilled range and heavy physical demand), and foundry worker (found at 519.687-022 in the D.O.T. with a SVP placing it in the "unskilled" range and heavy physical demand. [R. 65.]

The ALJ asked the vocational expert if an individual capable of light work but limited to occasionally climbing ramps and stairs, never climbing ladders, ropes, or scaffolds, occasionally balancing frequently stooping, kneeling, crouching, and crawling, less than concentrated exposure to unprotected heights or moving machinery, and performing simple, repetitive tasks for two hours segments with goal oriented work rather than established quota rates, minimal

decision-making, a flexible pace, and occasional interaction with the general public could perform any of the claimant's past relevant work.  [R. 65-67.]  Dr. Bordieri testified that such a person would be unable to perform any of the past jobs, but could perform jobs such as a stock or order clerk (found at 222-487.014 in the D.O.T. with an unskilled SVP of 2, light physical demand, and 5,500 positions in the State of Indiana), unskilled cafeteria worker (found at 311.677-010 in the D.O.T. with light physical demand, no SVP provided, and 3,700 positions in Indiana), and unskilled laundry worker (found at 369.687-010 in the D.O.T. with an SVP of 2, light physical demand, and 1,000 positions in Indiana).  [*Id.*]

Finally, counsel requested the ALJ ask a medical expert whether the claimant met listing 12.02 for Organic Mental Disorders. The ALJ did not provide a response but indicated she would consider the request.  [R. 69-70.]

### C.  ALJ Determination

The ALJ issued an unfavorable determination on June 17, 2010.  The ALJ found that Mr. Hill suffered from the following severe impairments: history of anoxic encephalopathy, left ventricle dysfunction secondary to alcoholic cardiomyopathy, coronary artery disease, hypertension, cognition disorder, depression, and a history of alcohol abuse.  [R. 18.]

At Step Three of the sequential evaluation process, the ALJ held that none of Mr. Hill's impairments met the applicable listings of 20 C.F.R. Part 404, Subpart P, Appendix 1.  [R. 19.] She considered the following listings: 4.02, Chronic Heart Failure, 4.04, Ischemic Heart Disease, 12.02, Organic Mental Disorders, 12.04, Affective Disorders, and 12.06, Anxiety Related Disorders.  [R. 19-20.]

She found Mr. Hill retained the RFC to lift twenty pounds occasionally and ten pounds frequently, stand, walk, or sit for six hours in an eight hour day, occasionally climb ramps and

stairs, never climb ladders, ropes, or scaffolding, occasionally balance, frequently stoop, kneel, crouch, and crawl, and simple, repetitive tasks in two hour segments. He should avoid concentrated exposure to noise, vibration, fumes, odors, gases, poor ventilation, and hazards such as machinery and heights. Lastly, he could not perform established quota rate work but instead must perform "goal oriented work." [R. 20-21.]

To support this RFC, the ALJ pointed to multiple considerations. First, she concluded the claimant's allegations were "not consistent with a claim of disability" because of multiple inconsistencies within the record. [R. 26.] She pointed to Mr. Hill's testimony that his memory had returned "some" since his heart attack. [*Id*.] She highlighted his recitation of his past employment and the reasons for leaving his previous job as evidence his remote memory was intact. [*Id*.] The ALJ identified another inconsistency to be the claimant's testimony of continued alcohol use, writing that this noncompliance "could actually" be contributing to any deterioration of his health. [R. 26.] The ALJ found "no acceptable objective documentation in the file that supports the claimant's allegation of disability." [R. 27.]

The ALJ also determined Mr. Hill's reported activities of daily living did not support his claim of disability. [R. 27.] She pointed to his testimony that he attends to his personal care, mows the grass, fishes with his neighbor twice a week, attends church every Sunday, plays basketball and fishes with his sons, lives with his elderly parents, and reads the newspaper. The ALJ wrote that such activities were "in excess" of those one would expect from a disabled person. [*Id*.]

Regarding the weight accorded to opinion evidence, the ALJ rejected the opinion of the examining consultative examiner that the claimant exhibited generalized confusion and was mildly mentally disabled. [R. 22.] She accorded the opinion weight only in that identified no

physical limitations. [*Id*.] She found that the medical doctor who performed the examination was not "qualified to render an opinion as to the claimant's mental functioning as he is not licensed or specialized in that area." [*Id*.]

The ALJ also dismissed the opinion of the claimant's treating physician that Mr. Hill was "permanently disabled" due to his cognitive deficits. [R. 23.] She concluded this opinion merited "no weight" because it was contrary to the medical evidence of record as well as the claimant's report of activities of daily living. [*Id*.] The ALJ rejected a treating cardiologist's opinion that Mr. Hill's mental status precluded "meaningful employment" because "it is outside of the area of expertise of this physician and is not supported by the relevant evidence." [R. 23-24.] She noted Dr. Gardner's opinion that the claimant exhibited extremely poor memory and mild mental retardation, writing, "This examination was assigned weight in that the claimant's attorney sent him for this test and yet this test only indicated mild symptoms." [R. 24-25.] Finally, the ALJ accorded "partial weight" to the reviewing DDB doctor's opinion that the claimant was limited to sedentary, simple work because "the evidence indicated additional limitations were required." [R. 25.]

At Step Four, the ALJ concluded Mr. Hill was unable to perform his past relevant work as a fork lift operator, laborer, trailer assembler, and foundry worker. [R. 26.] At Step Five, the ALJ ruled that the claimant was capable of performing the duties of an order-filler, a cafeteria worker, and a laundry worker. [R. 28.] Plaintiff's claim for benefits was denied upon the Step Five finding. [R. 29.]

## II.
### DISCUSSION

This Court's role in this action is limited to ensuring that the ALJ applied the correct legal standards and that substantial evidence exists for the ALJ's (and ultimately the

Commissioner's) findings.  *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004) (citation

omitted).  "Substantial evidence is such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion."  *Id.* (quotation omitted).  Because the ALJ "is in the best

position to determine the credibility of witnesses," *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir.

2008), the Court must afford the ALJ's credibility determinations "considerable deference,"

overturning them only if they are "patently wrong," *Prochaska v. Barnhart*, 454 F.3d 731, 738

(7th Cir. 2006) (quotations omitted).  If the ALJ committed no legal error and substantial

evidence exists to support the ALJ's decision, the Court must affirm the denial of benefits.

Otherwise the Court must generally remand the matter back to the Social Security

Administration for further consideration; only in rare cases can the Court actually order an award

of benefits.  *See Briscoe v. Barnhart*, 425 F.3d 345, 355 (7th Cir. 2005).

> To evaluate a disability claim, an ALJ must use the following five-step inquiry:
>
> (1) [is] the claimant … currently employed, (2) [does] the claimant ha[ve] a severe impairment, (3) [is] the claimant's impairment … one that the Commissioner considers conclusively disabling, (4) if the claimant does not have a conclusively disabling impairment, …can [she] perform her past relevant work, and (5) is the claimant … capable of performing any work in the national economy[?]

*Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001) (citations omitted).  After Step Three,

but before Step Four, the ALJ must determine a claimant's Residual Functional Capacity

("RFC"), which represents the claimant's physical and mental abilities considering all of the

claimant's impairments.  The ALJ uses the RFC at Step Four to determine whether the claimant

can perform his own past relevant work and, if not, at Step Five to determine whether the

claimant can perform other work.  *See* 20 C.F.R. § 416.920(e).

Here, Mr. Hill claims the ALJ committed errors at Steps Two and Three.  [Dkt. 23 at 21,

28, 32.]  Specifically, Mr. Hill raises the following issues: (1) whether the ALJ failed to employ

the Special Technique required at Step Two; and (2) whether the ALJ erred at Step Three in deciding that Mr. Hill's impairments did not meet or medically equal a listing. [*Id*.]

### 1. The ALJ's Use of the Special Technique at Step Two

Mr. Hill first argues that first argues that the ALJ erred in concluding that he did not meet or medically equal a listing. [Dkt. 23 at 21.] Specifically, he claims that the ALJ did not employ the "special technique" at Step Two. [*Id*.]

The special technique is set forth in 20 C.F.R. § 404.1520a, and it is used to analyze whether a claimant has a medically determinable mental impairment and whether that impairment causes functional limitations. If a limitation is of listings-level severity, then the claimant is conclusively disabled. Thus, the special technique is used to evaluate mental impairments at Steps Two and Three of the five-step evaluation. *See* SSR 96-8p.

The special technique requires that the ALJ evaluate the claimant's "pertinent symptoms, signs, and laboratory findings" to determine whether the claimant has a medically determinable mental impairment. 20 C.F.R. § 404.1520a(b)(1). If the claimant has a medically determinable mental impairment, then the ALJ must document that finding and rate the degree of functional imitation in four broad areas, collectively referred to as the "B criteria": activities of daily living, social functioning, concentration, persistence, or pace; and episodes of decompensation. *Id*. § 404.1520a(c)(3).

The ALJ must document the use of the special technique by incorporating the pertinent findings and conclusions into the written decision, which must elaborate on significant medical history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the mental impairment's severity. The decision must

also incorporate "a specific finding as to the degree of limitation in each of the functional areas." *Craft v. Astrue*, 539 F.3d 668, 674-75 (7th Cir. 2008).

While Mr. Hill argues that the ALJ's technical failure to explicitly use the special technique at Step Two warrants remand, [dkt. 23 at 17], as the Commissioner correctly points out, such an error may be harmless, depending on whether the ALJ properly considered the claimant's impairments elsewhere in the five-step analysis. *See Craft*, 539 F.3d at 675. ("Under some circumstances, the failure to explicitly use the special technique may indeed be harmless error.").  *See also Richards v. Astrue*, 370 Fed. Appx. 727 (7th Cir. 2010) ("An ALJ's failure to explicitly use the special technique may be harmless error, but here, however, the ALJ's misstep is compounded by other errors in her analysis, and the combined effect of these errors requires a remand.").  Accordingly, the Court does not find cause to remand solely on that ground and will consider the propriety of the ALJ's later analyses.

### 2.  The ALJ's Step Three Determination

Mr. Hill also contends that the ALJ's findings at Step Three constitute error. Specifically, Mr. Hill argues that the ALJ inadequately analyzed his condition, that she should have consulted a medical expert ("ME") at the hearing to determine whether Mr. Hill's combined impairments were of listings-level severity, and that she improperly weighed medical opinion evidence.  [Dkt. 23 at 21, 28, 32.]  In response, the Commissioner argues that the ALJ's findings were supported by substantial evidence in the record, that ME testimony was unnecessary given the "ample evidence" already in the record, and that the ALJ gave proper weight to the various medical personnel who assessed or treated Mr. Hill following his trauma. The Court agrees.

First, Mr. Hill faults the ALJ with not considering his impairments under Listing 11.18, which governs cerebral trauma and directs the evaluator to Listings 11.02, 11.03, 11.04 and 12.02, as applicable. However, the ALJ did specifically consider and reject 12.02, and there is no evidence in the record to support the notion that Listings 11.02, 11.03 (which both require a diagnosis of epilepsy), or 11.04 (which require evidence of aphasia or disorganization of motor function in two extremities) are applicable to Mr. Hill. Therefore, Mr. Hill has not persuaded the Court that remand is warranted on that ground. *See Maggard v. Apfel*, 167 F.3d 376, 380 (7th Cir. 1999) ("The claimant bears the burden of proving his condition meets or equals a listed impairment.").

Second, while Mr. Hill maintains that the ALJ should have called a medical expert to consider whether Mr. Hill's combined impairments medically equaled a listing, [dkt. 23 at 28], the Commissioner cites 20 C.F.R. § 404.1527(c)(3) in arguing that "an ALJ is required to call a medical expert only when the record is insufficient upon which to make a determination of disability," and contends that the ALJ had sufficient from which to make her determination. [Dkt. 30 at 9.] Given the ample record containing medical opinions and evaluations from treating, examining, and reviewing physicians, and in light state reviewing physicians' uncontested determinations that Mr. Hill's impairments were not medically equivalent to a listing, the Court agrees with the Commissioner. *See Sheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004) (finding no error when the question of medical equivalence was considered by physicians at the initial and reconsideration levels of review). Furthermore, although Mr. Hill challenges whether the ALJ properly included his father's testimony in her consideration of the record, the Court notes that the ALJ did consider Mr. Hill's father's testimony, particularly with respect to his memory. [R. 21]. As the Commissioner correctly points out, however, the ALJ

was not required to expressly evaluate every portion of Mr. Hill's father's testimony where it was redundant with other testimony. *Books v. Chater*, 91 F.3d 972, 980 (7th Cir. 1996) (finding that the ALJ did not err by not addressing testimony that did not constitute a "separate 'line of evidence' but 'served strictly to reiterate, and thereby corroborate plaintiff's testimony.'"). The Court does not find that remand is warranted on this ground either.

Lastly, Mr. Hill challenges the weight the ALJ afforded the medical opinions in the record. An ALJ can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice. *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003). Also, treating physician opinions are generally weighted more heavily than consulting physician opinions. 20 CFR § 416.927(d)(2). Opinions that are inconsistent with the "record as a whole" are generally weighted less heavily than opinions that are consistent. *Id.* at (d)(4). Additionally, "[a] statement by a medical source that [a claimant is] 'disabled' or 'unable to work' does not mean that [the Commissioner] will determine that [the claimant is] disabled." *Id.* at (e) ("We will not give any special significance to the source of an opinion on issues reserved to the Commissioner…"). Nevertheless, the Court notes that the ALJ is required to consult the advice of a medical expert before making his Step Three determination, *Barnett*, 381 F.3d at 670, but sometimes experts disagree, and the ALJ must make "a reasonable choice among conflicting medical opinions." *Leger v. Tribune Co. Long Term Disability Ben. Plan*, 557 F.3d 823, 829 (7th Cir. 2009) (quotations omitted). *See also Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th Cir. 1996) ("When treating and consulting physicians present conflicting evidence, the ALJ may decide whom to believe, so long as substantial evidence supports that decision.").

19

Here, the ALJ reasonably considered the physicians' opinions and detailed her reasons for the amount of weight she prescribed to them.    Mr. Hill challenges the weight the ALJ assigned to Dr. Mina's opinion regarding his ability to follow instructions, but as the ALJ noted, Dr. Mina does not specialize in mental impairments, and it was reasonable for the ALJ to assign less weight on that opinion.  20 C.F.R. § 404.1527(d)(5).  *See also White v. Barnhart*, 415 F.3d 654, 660 (7th Cir. 2005) ("The ALJ credited Dr. Steiner's opinion to the extent that it related to his specialty … and discounted [his] opinion when he strayed from his area of expertise.  This was a reasonable way to distinguish among Dr. Steiner's opinions.").  Further, the ALJ reasonably considered that Dr. McCoy's and Dr. Davidson's opinions were consistent with each other and the record as a whole, and did not err in choosing to credit their opinions over that of Dr. Gardner.  *Leger*, 557 F.3d at 829.

Furthermore, to the extent that Dr. Anthony opined that Mr. Hill was disabled, the ALJ was not required to assign that opinion any weight as the ultimate question of disability is one reserved for the Commissioner.  *See* 20 CFR § 416.927(e).  ("We will not give any special significance to the source of an opinion on issues reserved to the Commissioner…").  *See also Johansen v. Barnhart*, 314 F.3d 283, 288 (7th Cir. 2002) ("Dr. Olsen's general opinion that Johansen was 'unable to work … is not conclusive on the ultimate issue of disability, which is reserved to the Commissioner.").  Accordingly, the Court finds that remand is not warranted on this ground.

### III.
#### CONCLUSION

The standard for disability claims under the Social Security Act is stringent.  "Even claimants with substantial impairments are not necessarily entitled to benefits, which are paid for by taxes, including taxes paid by those who work despite serious physical or mental impairments

and for whom working is difficult and painful." *Williams-Overstreet v. Astrue*, 364 Fed. Appx. 271, 274 (7th Cir. 2010). Furthermore, the standard of review of the Commissioner's denial of benefits is narrow. *Id.* Taken together, the Court can find no legal basis for overturning the ALJ's determination that Mr. Hill does not qualify for disability benefits. Final judgment will issue accordingly.

01/24/2013

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

**Distribution via ECF:**

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov

Joseph R. Wambach
KELLER & KELLER
joew@2keller.com

Timothy Burns
KELLER & KELLER
timb@2keller.com